IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL CAROTHERS,           )
                             )
          Plaintiff,         )
                             )
     vs.                     )  Civil Action No. 09-211
                             )
COMMISSIONER OF SOCIAL       )
SECURITY,                    )
                             )
          Defendant.         )

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Plaintiff, Michael Carothers, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying his applications for disability insurance
benefits ("DIB") and supplemental security income ("SSI") under
Titles II and XVI, respectively, of the Social Security Act, 42
U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently before the Court
are the parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's
motion for summary judgment will be granted and the

---

[1]The Social Security system provides two types of benefits
based on an inability to engage in substantial gainful activity:
the first type, DIB, provides benefits to disabled individuals
who have paid into the Social Security system during past
employment, and the second type, SSI, provides benefits to
disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the
Social Security system.  Belcher v. Apfel, 56 F.Supp.2d 662
(S.D.W.V. 1999).  Based on his earnings record, Plaintiff is
insured for purposes of DIB through December 31, 2010.  (R. 19).

1

Commissioner's cross-motion for summary judgment will be denied.

## II.  **PROCEDURAL HISTORY**

Plaintiff protectively filed applications for DIB and SSI on January 20, 2006, alleging disability since January 5, 2005 due to the combined effect of several medical conditions.  (R. 109). Following the denial of Plaintiff's applications for DIB and SSI, he requested a hearing before an Administrative Law Judge ("ALJ").  (R. 74-75).  At the hearing, which was held on September 5, 2007, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.  (R. 39-68).

On December 21, 2007, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI based on his conclusion that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2]  (R. 16-29).  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on December 24, 2008.  (R. 5-7, 11-12).  Thus, the ALJ's decision became the final decision of the Commissioner.  This appeal followed.

## III.  **STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as

---

[2]The Social Security Regulations define RFC as the most a claimant can still do despite his or her limitations.  See 20 C.F.R. § 404.1545.

a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## IV. PERSONAL BACKGROUND

Plaintiff was born on March 27, 1962. With respect to education, Plaintiff graduated from high school in 1982. (R. 43, 113). At the time of the hearing before the ALJ, Plaintiff, who is 6'1" tall, weighed 334 pounds, and he smoked 1½ packs of cigarettes a day. (R. 47). In the past, Plaintiff has been employed as an ambulance attendant in a power plant (1987 to 1993), a security guard/emergency medical technician for a steel company (1993 to 1998) and a laborer for a veneer manufacturer (1998 to January 2005). (R. 44, 91).

On January 5, 2005, Plaintiff underwent surgery to remove a cystic mass from his abdomen. (R. 50-51, 63-64, 135-43). When Plaintiff was medically cleared to return to work, the employees at his company were on strike. The strike eventually ended and Plaintiff returned to work in August 2005. After two weeks,

3

however, Plaintiff was permanently laid off due to a reduction in force by the employer. For the next six months, Plaintiff received unemployment compensation.[3] (R. 45-47, 142).

Plaintiff testified that he is no longer able to work due to the combined effects of several medical conditions. (R. 63). Plaintiff's main problem, however, is daytime drowsiness and fatigue as a result of sleep apnea, which requires him to nap in the afternoon.[4] (R. 53-54). Plaintiff testified that he is not limited in his ability to sit. However, his ability to stand is

---

[3]During the hearing before the ALJ, Plaintiff's counsel noted that to be eligible for unemployment compensation, a person must be willing and able to work. Counsel then asked Plaintiff if he could have worked a full-time schedule during the 6-month period he received unemployment compensation (until February 2006), and Plaintiff responded "probably." (R. 62). Under the circumstances, Plaintiff's alleged onset date of disability of January 5, 2005 should be amended to a date after February 2006.

[4]Sleep apnea is a condition characterized by episodes of breathing cessation during sleep. For reasons that are unclear, in deep sleep, breathing can stop for a period of time (often more than 10 seconds). These periods of lack of breathing, or apneas, are followed by sudden attempts to breathe. These attempts are accompanied by a change to a lighter stage of sleep. The result is fragmented sleep that is not restful, leading to excessive daytime drowsiness. Weight management (or intentional weight loss) and avoiding alcohol and sedatives at bedtime may relieve sleep apnea in some individuals. If these measures are unsuccessful, continuous positive airway pressure ("CPAP") or bilateral positive airway pressure ("BiPAP"), forms of mechanical breathing assistance that involve the use of a specially designed mask worn over the nose or nose and mouth at night, may be prescribed. www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).

4

limited to 30 to 45 minutes;[5] his ability to walk is limited to 30

minutes on flat surfaces; and he gets "out of breath real quick"

when walking up hills or climbing stairs.  (R. 59).

## V.  MEDICAL EVIDENCE

Plaintiff has longstanding diagnoses of diabetes,[6] sleep

apnea, asthma[7] and chronic obstructive pulmonary disease

("COPD").[8]  Dr. Alex Kalenak has been Plaintiff's primary care

physician ("PCP") since January 2004.  For Plaintiff's diabetes,

Dr. Kalenak prescribes Avandia and Glucophage, as well as daily

self-administered shots of Novolog and Lantus.[9]  (R. 50, 119, 246-

---

[5]Plaintiff testified that his legs begin to hurt and he gets a burning sensation when he is on his feet too much.  (R. 55).

[6]Diabetes is a chronic (lifelong) disease marked by high levels of sugar (glucose) in the blood.  Insulin is a hormone produced by the pancreas to control blood sugar.  Diabetes can be caused by too little insulin, resistance to insulin, or both. After many years, diabetes can lead to serious problems throughout your body, including your eyes, kidneys, heart and nerves.  www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).

[7]Asthma is an inflammatory disorder of the airways which causes attacks of wheezing, shortness of breath, chest tightness and coughing.  www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).

[8]COPD is a lung disease that makes it difficult to breathe. There are two main forms of COPD: (1) chronic bronchitis, which causes long-term swelling and a large amount of mucus in the main airways in the lungs and (2) emphysema, a lung disease that destroys the air sacs in the lungs.  Smoking is the leading cause of COPD for which there is no cure.  www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).

[9]Avandia is used along with a diet and exercise program and sometimes with one or more other medications to treat type 2

5

82, 283-348, 356-400, 401-08).  Dr Kalenak also prescribes the

following medications for Plaintiff's other medical conditions:

Lasix (swelling in legs and feet), Potassium (taken in

conjunction with Lasix), Prevacid (gastroesophageal reflux

disease or "GERD"), Neurontin (diabetes-related leg pain) and

Amitriptyline (depression and difficulty sleeping).[10]  (R. 52-53,

119-20).

---

diabetes (a condition in which the body does not use insulin
normally and, therefore, cannot control the amount of sugar in
the blood).  It works by increasing the body's sensitivity to
insulin, a natural substance that helps control blood sugar
levels.  Glucophage is used alone or with other medications,
including insulin, to treat type 2 diabetes.  It works by
decreasing the amount of glucose you absorb from your food and
the amount of glucose made by your liver.  Novolog is used to
treat people with type 2 diabetes who need insulin to control
their diabetes.  It works by helping move sugar from the blood
into other body tissues where it is used for energy.  It also
stops the liver from producing more sugar.  Lantus is used to
treat people with type 2 diabetes who need long-acting insulin to
control their diabetes.  It is a man-made version of human
insulin, a hormone made in the pancreas that helps move sugar
from the blood into other body tissues where it is used for
energy.  www.nlm.nih.gov/medlineplus/druginfo (last visited
9/25/2009).  Prior to Dr. Kalenak, Dr. Robert C. Knapp, an
endocrinologist, treated Plaintiff for diabetes.  However,
Plaintiff was compelled to stop treating with Dr. Knapp after he
lost his health insurance because the doctor does not accept
medical assistance cards.  (R. 50).

[10]Lasix, a "water pill," is used to reduce the swelling and
fluid retention caused by various medical conditions including
heart disease.  Potassium is essential for the proper functioning
of the heart, kidneys, muscles, nerves and digestive system.
Prevacid is used to treat GERD, a condition in which backward
flow of acid from the stomach causes heartburn and injury of the
food pipe.  Neurontin is used, among other things, to relieve the
pain of postherpetic neuralgia.  Amitriptyline is used to treat
symptoms of depression.  www.nlm.nih.gov/medlineplus/druginfo
(last visited 9/25/2009).

6

Plaintiff was seen by Dr. Jeffrey A. Erukhimov, a pulmonary specialist, on May 24, 2004, following a referral by Dr. Kalenak for complaints of interrupted sleep, coughing and shortness of breath on exertion.[11]  With respect to sleep apnea, Plaintiff reported that he continued to wake up during the night despite the use of a BiPAP machine.[12]  As to Plaintiff's respiratory symptoms, Dr. Erukhimov's impression was asthma and chronic bronchitis from cigarette smoking.  Dr. Erukhimov continued Plaintiff's then current medications, including Combivent, Advair and Atrovent inhalers, and he added Singulair to Plaintiff's medication regime.[13]  (R. 243-45).

---

[11]At the time of his initial evaluation by Dr. Erukhimov, Plaintiff weighed 350 pounds.  (R. 244).

[12]During the hearing, Plaintiff testified that although he has used a CPAP or BiPAP machine for seven years, he has never been able to sleep through the night because he tosses and turns and the mask comes loose waking him up.  He sleeps four to five hours a night but not consecutively.  As a result, he has to take a nap in the afternoon.  (R. 60-61).

[13]Combivent is used to prevent wheezing, difficulty breathing, chest tightness and coughing in people with COPD.  It is in a class of medications called bronchodilators that work by relaxing and opening the air passages to the lungs making breathing easier.  Advair is used to prevent wheezing, shortness of breath and breathing difficulties caused by asthma and COPD. It is in a class of medications called steroids that work by relaxing and opening air passages in the lungs, making it easier to breathe.  Like Combivent, Atrovent (Ipratropium oral inhalation) is a bronchodilator.  Singulair is used to prevent difficulty breathing, chest tightness, wheezing and coughing caused by asthma.  It works by blocking the action of substances in the body that cause the symptoms of asthma.  www.nlm.nih.gov/ medlineplus/druginfo (last visited 9/25/2009).

7

Due to complaints of chest pain, Dr. Kalenak ordered a treadmill stress test for Plaintiff which was performed on June 25, 2004.[14] Plaintiff exercised for 4 minutes, 30 seconds before the stress test was stopped due to increased blood pressure and fatigue. The stress test was negative for ischemia and exercise-induced chest pain.[15] However, Plaintiff's functional capacity and hypertensive response to exercise during the stress test were described as "terrible" and "marked," respectively. (R. 128).

Plaintiff's first follow-up visit with Dr. Erukhimov, the pulmonary specialist, took place on August 12, 2004. Plaintiff continued to report daytime sleepiness despite the use of a BiPAP machine, as well as coughing, wheezing and increased shortness of breath on exertion. Dr. Erukhimov described Plaintiff as "quite sleepy," noting that Plaintiff's score on the Epworth Sleepiness Scale that day was "at least 15."[16] Dr. Erukhimov's plan for

---

[14]An exercise stress test is a screening tool to test the effect of exercise on your heart. It provides an overall look at the health of your heart. www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).

[15]Cardiac ischemia occurs when blood flow to the heart muscle is decreased by a partial or complete blockage of a coronary artery. A sudden, severe blockage may lead to a heart attack. It may also cause a serious abnormal heart rhythm, which can cause fainting or even sudden death. www.mayoclinic.com (last visited 9/25/2009).

[16]The Epworth Sleepiness Scale is a validated questionnaire that is used to assess daytime sleepiness. The scale rates how likely you are to doze off or fall asleep in 8 situations (e.g., sitting and reading, watching television and sitting inactive in a public place such as a theatre or a meeting). A score of 1 to

8

Plaintiff included adjusting the air pressure of his BiPAP
machine; he instructed Plaintiff not to drive when sleepy and to
lose weight; and he added a Spiriva inhaler to Plaintiff's
medication regime.[17]  (R. 241-42).

Due to the results of Plaintiff's treadmill stress test in
June 2004, Dr. Kalenak referred Plaintiff to Dr. Angel R. Flores,
a cardiologist, who evaluated Plaintiff on September 17, 2004.
As a result of Plaintiff's obesity, the initial heart studies
ordered by Dr. Flores were of poor quality, leading the doctor to
refer Plaintiff for a MUGA scan.[18]  Dr. Flores "strongly urged"
Plaintiff to stop smoking and recommended gastric bypass surgery
for weight reduction.[19]  Because Plaintiff's blood work revealed

---

6 indicates that you are getting enough sleep; a score of 7 or 8
is average; and a score of 9 or above indicates that you should
seek the advice of a sleep specialist without delay.
www.sleepeducation.com (last visited 9/25/2009).

[17]Spiriva is used to prevent wheezing, shortness of breath
and difficulty breathing in patients with COPD.  Like Combivent
and Atrovent, Spiriva is a bronchodilator. www.nlm.nih.gov/
medlineplus/druginfo (last visited 9/25/2009).

[18]A MUGA scan is a non-invasive test that uses radioactive
materials called tracers to show the heart chambers.  The test
can check the overall squeezing strength of the heart known as
the ejection fraction.  A normal result (or an ejection fraction
above 55%) indicates that the heart squeezing function is normal.
www.nlm.nih.gov/medlineplus/encyc (last visited on 9/25/2009).
The result of Plaintiff's MUGA scan, which was performed on
September 24, 2004, was normal (57% ejection fraction).  (R.
122).

[19]Gastric bypass is surgery that is done to help you lose
weight.  After the surgery, you will not be able to eat as much

low high-density lipoprotein ("HDL"), also called "good"

cholesterol,[20] Dr. Flores prescribed Tricor for Plaintiff.[21]  (R.

123).  On January 17, 2005, Dr. Flores added Zocor to Plaintiff's

medication regime.[22]  (R. 123).  At some point thereafter, Dr.

Flores also added Zetia to Plaintiff's medication regime.[23]  (R.

---

as before, and your body will not absorb all the calories from the food you eat.  www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).  In his decision, the ALJ implies that Plaintiff has refused to undergo gastric bypass surgery despite the recommendations of his doctors that he lose weight. ("Although weight loss has been recommended to him, he has not had bypass surgery." (R. 25)).  The Court notes, however, that Plaintiff offered the only evidence concerning this issue, testifying that after his permanent layoff, he no longer had health insurance and could not afford gastric bypass surgery. (R. 47, 123).  There is no evidence that Plaintiff has refused to undergo gastric bypass surgery.

[20]Lipoproteins, which are made of fat and protein, carry cholesterol, triglycerides and other fats called lipids in the blood to various parts of the body.  www.nlm.nih.gov/ medlineplus/encyc (last visited 9/25/2009).

[21]Tricor is used with diet changes (restriction of cholesterol and fat intake) to reduce the amount of cholesterol and triglycerides (fatty substances) in your blood.  Accumulation of cholesterol and fats along the walls of your arteries decreases blood flow and, therefore, the oxygen supply to your heart, brain and other parts of your body.  Lowering your blood level of cholesterol and fats may help to prevent heart disease, angina (chest pain), strokes and heart attacks.  www.nlm.nih.gov/ medlineplus/druginfo (last visited 9/25/2009).

[22]Zocor is used together with lifestyle changes (diet, weight loss, exercise) to reduce the amount of cholesterol and other fatty substances in your blood. It is in a class of medications called HMG-CoA reductase inhibitors.  Zocor works by slowing the production of cholesterol in the body.  www.nlm.nih.gov/ medlineplus/druginfo (last visited 9/25/2009).

[23]Zetia is used together with lifestyle changes (diet, weight loss, exercise) to reduce the amount of cholesterol and other

10

119).

On December 17, 2004, Plaintiff was admitted to the hospital for complaints of nausea and vomiting. At the time of admission, it was noted that Plaintiff's medical conditions included obesity, diabetes, hypertension, COPD, diabetic neuropathy[24] and depression. Following a consultation with Plaintiff, Dr. Stephen Bellich recommended exploratory surgery for a possible abdominal mass. Due to Plaintiff's request that the surgery be scheduled after Christmas, he was discharged on December 18, 2004. (R. 215-25).

On December 27, 2004, Plaintiff saw Dr. Erukhimov, his pulmonary specialist, for a follow-up visit. In a letter to Dr. Kalenak concerning this visit, Dr. Erukhimov noted that he had been following Plaintiff for obstructive hypoventilation syndrome ("OHS")[25] with sleep apnea; that Plaintiff's asthma had been "well

---

fatty substances in the blood. It may be used alone or in combination with an HMG-CoA reductase inhibitor. Zetia works by preventing the absorption of cholesterol in the intestine. www.nlm.nih.gov/medlineplus/druginfo (last visited 9/25/2009).

[24]Over time, diabetes (high blood sugar levels) can damage the covering on your nerves or the blood vessels that bring oxygen to your nerves. Damaged nerves may stop sending messages, or may send messages slowly or at the wrong times. This damage is called diabetic neuropathy, and about 50% of people with diabetes get it. Symptoms may include numbness in your hands, legs or feet and shooting pains, burning or tingling. www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).

[25]OHS is believed to result from both a defect in the brain's control over breathing and excessive weight against the chest wall, which makes it hard for a person to take a deep breath. As a result, the blood has too much carbon dioxide and not enough

11

controlled lately;" that Plaintiff did well during a sleep study
on November 15, 2004 with adjustments to the pressure of his
BiPAP machine; and that Plaintiff continued to weigh 350 pounds.
Dr. Erukhimov described his impression as "Asthma, relatively
well controlled" and indicated that Plaintiff would continue to
use his inhalers as prescribed. In addition, Dr. Erukhimov
indicated that the pressure of Plaintiff's BiPAP machine would be
adjusted. (R. 234-36).

On January 5, 2005, Plaintiff was admitted to the hospital
for exploratory stomach surgery during which a benign cystic mass
was removed. Post-operatively, Plaintiff's COPD was managed by
Dr. Nicholas Tapyrik who noted that Plaintiff suffers from
smoking-related chronic bronchitis, smoking-aggravated asthmatic
bronchitis, obesity and sleep apnea, and that Plaintiff "always
has a chronic cough." For his diabetes, Plaintiff was managed
post-operatively by Dr. Robert Knapp who noted that Plaintiff's
diabetes was out of control with severe insulin resistance from
the surgery; that Plaintiff had asthmatic bronchitis with an
acute flare-up of his COPD; and that Plaintiff's hypertension was
under poor control due to the exacerbation of his COPD.
Plaintiff was discharged from the hospital on January 9, 2005.
(R. 135-43, 150-51, 163-64).

---

oxygen. People with OHS are often tired due to sleep loss and
poor sleep quality. www.nlm.nih.gov/medlineplus/encyc (last
visited 9/25/2009).

12

On December 31, 2005, Plaintiff went to the emergency room with complaints of chest pain. He also reported that his asthma had been "acting up" the previous two days. Plaintiff was admitted to the hospital after blood tests revealed elevated blood sugar levels.[26] A pulmonary function study revealed a mild to moderate restrictive defect consistent with Plaintiff's weight, as well as a mild to moderate obstructive defect that did not improve after Plaintiff's use of an inhaled bronchodilator. Following a cardiac catherization which was normal, Plaintiff was diagnosed with non-ischemic cardiomyopathy with mild left ventricular dysfunction.[27] (R. 189-204).

On April 11, 2006, a non-examining State agency medical consultant completed a Physical RFC Assessment for Plaintiff in connection with his applications for DIB and SSI. Based on a review of the evidence in Plaintiff's administrative file at that time, the consultant opined that Plaintiff retained the RFC to

---

[26]At the time of Plaintiff's hospital admission on December 31, 2005, his blood sugar level was 812 mg/dL. (R. 195). Normal blood sugar levels in people who do not have diabetes are 70 to 99 mg/dL upon waking and 70 to 140 mg/dL after meals. http:// diabetes.niddk.nih.gov/dm (last visited 9/25/2009). Plaintiff's blood sugar levels by the time of his discharge from the hospital on January 4, 2006 were consistently in the 200 range. (R. 193).

[27]Cardiomyopathy is a weakening of the heart muscle or a change in heart muscle structure. It is often associated with inadequate heart pumping or other heart function problems. www.nlm.nih.gov/medlineplus/encyc (last visited 9/25/2009).

13

perform light work.[28]  Specifically, the consultant opined that
Plaintiff could occasionally lift and carry 20 pounds and
frequently lift and carry 10 pounds; that Plaintiff could stand
and/or walk about 6 hours in an 8-hour workday; that Plaintiff
could sit about 6 hours in an 8-hour workday; that Plaintiff's
ability to push and pull with his upper and lower extremities was
unlimited; that Plaintiff could occasionally engage in postural
activities such as climbing, balancing, stooping, kneeling,
crouching and crawling; and that Plaintiff had no environmental
limitations.[29]  (R. 349-55).

Medical records which were submitted shortly before the ALJ
hearing show that Plaintiff was seen by his PCP, Dr. Kalenak, on
a regular basis to monitor his diabetes - July 31, 2006 (R. 379),
October 10, 2006 (R. 376), November 14, 2006 (R. 374), December
28, 2006 (R. 371), February 20, 2007 (R. 369), March 27, 2007 (R.
367), April 26, 2007 (R. 366), June 26, 2007 (R. 362), July 9,
2007 (R. 359), July 31, 2007 (R. 358).  During this period, Dr.
Kalenak also treated Plaintiff for other complaints, including

---

[28]The Social Security Regulations define light work as
"lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds.  Even though the
weight lifted may be very little, a job is in this category when
it requires a good deal of walking or standing, or when it
involves sitting most of the time with some pushing and pulling
of arm or leg controls."  See 20 C.F.R. §§ 404.1567(b) and
416.967(b).

[29]Inexplicably, the consultant found no environmental
limitations despite Plaintiff's well-documented diagnoses of
asthma and COPD.

14

bilateral knee pain of several months' duration on May 11, 2006
(R. 382) and a buttock abscess on July 29, 2007 (R. 361). Dr.
Kalenak's records also contain numerous memos regarding refills
of Plaintiff's medications, as well as reports of blood tests
ordered for Plaintiff. (R. 357, 360, 363-65, 368, 370, 372-73,
375, 377-78, 383-86, 388-400).

On August 31, 2007, Dr. Kalenak completed two assessments in
connection with Plaintiff's applications for DIB and SSI. In the
first assessment which pertained to Plaintiff's ability to
perform work-related mental activities, Dr. Kalenak opined that
Plaintiff's "multiple medical problems" seriously limit his
ability to, among other things, remember work-like procedures;
maintain regular attendance and be punctual within customary,
usually strict tolerances; sustain an ordinary work routine
without special supervision; work in coordination with or
proximity to others without being unduly distracted; perform at a
consistent pace without an unreasonable number and length of rest
periods; get along with co-workers; respond appropriately to
changes in a routine work setting; and deal with normal work
stress. In this assessment, Dr. Kalenak also rendered the
opinion that Plaintiff would be absent from work more than 4 days
per month due to his "multiple medical problems."[30]  (R. 402-03).

_____

[30]With respect to Dr. Kalenak's assessment of Plaintiff's
ability to perform work-related mental activities, the ALJ
declined to give "significant weight" to this assessment because
the evidence relating to Plaintiff's depression did not establish

15

In the second assessment which related to Plaintiff's RFC based on his diabetes, Dr. Kalenak noted that he sees Plaintiff every 1 to 3 months for treatment; that Plaintiff's diagnoses include diabetes, obesity, high cholesterol, COPD, sleep apnea and depression; and that Plaintiff's symptoms include, among others, fatigue, difficulty walking, swelling, general malaise, depression, extremity pain and numbness and difficulty concentrating. As to the need for unscheduled breaks during the workday, Dr. Kalenak opined that, on average, Plaintiff would need to rest every 10 minutes for 15 to 30 minutes. Concerning attendance, Dr. Kalenak again rendered the opinion that Plaintiff would be absent from work as a result of his medical conditions more than 4 days per month. (R. 404-08).

On August 31, 2007, Dr. Erukhimov, Plaintiff's treating pulmonologist since May 2004,[31] also completed two assessments relating to Plaintiff's applications for DIB and SSI. In the

_____

a severe mental impairment. (R. 20). As noted by Plaintiff, however, Dr. Kalenak clearly stated a number of times that his assessment of Plaintiff's ability to perform work-related mental activities, such as remembering, maintaining regular attendance and performing at a consistent pace without an unreasonable number and length of rest periods, was based on Plaintiff's "multiple medical problems." The doctor never attributed Plaintiff's difficulties in these areas to depression. (Document No. 10, p. 6). Therefore, the ALJ's basis for discounting this assessment was unfounded.

[31]With respect to the length of Plaintiff's treatment by Dr. Erukhimov, the ALJ in his decision mistakenly states on two occasions that Dr. Erukhimov began treating Plaintiff in May 2006, rather than May 2004. (R. 26-27).

16

first assessment which pertained to Plaintiff's RFC based on his sleep disorder, Dr. Erukhimov noted that Plaintiff's pulmonary diagnoses include chronic bronchitis, asthma, sleep apnea and OHS; that he sees Plaintiff every six months for treatment; and that, despite treatment, Plaintiff suffers from recurrent daytime sleep attacks which can occur suddenly and require Plaintiff to sleep for approximately 2 hours. Dr. Erukhimov opined, among other things, that Plaintiff's daytime sleepiness would frequently interfere with the attention and concentration needed to perform even simple work tasks during a typical workday; that Plaintiff would be unable to perform the following aspects of a competitive job: (a) public contact, (b) routine, repetitive tasks at a consistent pace, (c) detailed or complicated tasks, (d) strict deadlines, (e) close interaction with coworkers and supervisors, (f) fast paced tasks (production line) and (g) exposure to work hazards; that due to chronic fatigue, Plaintiff would need to take 7 unscheduled breaks during a workday to rest for approximately 45 minutes; and that Plaintiff's sleep disorder is at least as medically severe as Listing 11.03 in the Social Security Regulations relating to seizure disorder. (R. 410-13).

In the second assessment which addressed Plaintiff's RFC based on his pulmonary problems, Dr. Erukhimov noted that Plaintiff's symptoms include shortness of breath, fatigue and excessive daytime sleepiness. Dr. Erukhimov also noted that

17

Plaintiff suffers from acute asthma attacks approximately 2 times per month from which he is incapacitated for 2 or 3 weeks.  Dr. Erukhimov opined that Plaintiff is incapable of even low stress jobs because he is "very sleepy during the day."  Dr. Erukhimov further opined that Plaintiff would need unscheduled breaks to rest every 2 hours for 45 minutes to 2 hours during an 8-hour workday.  Finally, like Dr. Kalenak, Dr. Erukhimov opined that Plaintiff would be absent from work more than 4 days per month due to his medical conditions.  (R. 414-17).

## VI. DECISION OF THE ALJ

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process,[32] which was described by the United States Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\*    \*    \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted).  The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work.  See 20 C.F.R. §§ 416.920(a) through (c)(1989).  In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989).  If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further

---

[32]See 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).

18

inquiry.  § 416.920(d).  If the claimant cannot qualify
under the listings, the analysis proceeds to the fourth and
fifth steps.  At these steps, the inquiry is whether the
claimant can do his own past work or any other work that
exists in the national economy, in view of his age,
education, and work experience.  If the claimant cannot do
his past work or other work, he qualifies for benefits.
§§ 416.920(e) and (f).

\*    \*    \*

493 U.S. at 525-26.

With respect to the ALJ's application of the five-step

analysis in the present case, steps one and two were resolved in

Plaintiff's favor; that is, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since his alleged onset

date of disability and the medical evidence established that

Plaintiff suffers from the severe impairments of morbid obesity,

insulin-dependent diabetes mellitus, COPD, obstructive sleep

apnea and asthma.  (R. 19-20).  Turning to step three, the ALJ

found that Plaintiff did not have an impairment or combination of

impairments that met or equaled the requirements of any

impairment listed in Part 404, Subpart P, Appendix 1 of the

Social Security Regulations.  (R. 23-24).  Prior to proceeding to

step four, the ALJ assessed Plaintiff's RFC, concluding that

Plaintiff retained the RFC to perform at least sedentary work

with the following limitations:[33] (a) no job requiring the lifting

_____

[33]The Social Security Regulations define sedentary work as
"lifting no more than 10 pounds at a time and occasionally
lifting or carrying articles like docket files, ledgers, and
small tools.  Although a sedentary job is defined as one which
involves sitting, a certain amount of walking and standing is

19

or carrying of items weighing more than ten pounds; (b) no job involving frequent or prolonged standing or walking; (c) no job requiring exposure to hazards such as machinery or heights; and (d) no job in which he would be exposed to pulmonary irritants such as fumes, odors, dusts or gases. (R. 24-25). As to step four, the ALJ found that Plaintiff could not perform any of his past jobs in light of his RFC. (R. 28). Finally, at step five, based on the testimony of the VE, the ALJ found that considering Plaintiff's age, education, past work experience and RFC, there were a significant number of other jobs in the national economy which Plaintiff could perform, including the unskilled sedentary jobs of a telemarketer, a surveillance system monitor and an assembler. (R. 28-29).

## VII. **LEGAL ANALYSIS**

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000), quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999). Moreover, if a treating

---

often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." See 20 C.F.R. §§ 404.1567(a) and 416.967(a).

physician's medical opinion is well-supported and not
inconsistent with other substantial evidence in the case record,
an ALJ is required to give the opinion controlling weight, *i.e.,*
it must be adopted.  See 20 C.F.R. §§ 404.1527(d)(2) and
416.927(d)(2).

In support of his motion for summary judgment, Plaintiff
asserts that the ALJ erred by failing to give controlling weight
to the opinions rendered by his treating physicians in the RFC
assessments completed on August 31, 2007, which compel a
conclusion that he is disabled.  After consideration, the Court
concludes that Dr. Kalenak's opinion regarding Plaintiff's work-
related limitations was entitled to controlling weight.[34]
Competitive employment requires the ability to work on a regular
and continuing basis, *i.e.,* 8 hours a day, 5 days a week.  See
Social Security Ruling 96-8p.[35]  If adopted, the opinion rendered
by Dr. Kalenak in the RFC assessments completed on August 31,
2007 would dictate a finding that Plaintiff is unable to engage

---

[34]As noted by Plaintiff, the ALJ's error in failing to give
controlling weight to the opinion of Dr. Kalenak resulted in an
RFC assessment that did not include all of his work-related
limitations.  In turn, the VE's testimony in response to the
hypothetical question which was based on the inadequate RFC
assessment does not constitute substantial evidence supporting
the ALJ's decision.  (Document No. 10, pp. 13-19).

[35]Social Security Rulings are agency rulings published "under
the authority of the Commissioner of Social Security" and "are
binding on all components of the Social Security Administration."
Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).

21

in competitive employment as a result of his medical conditions.
For example, Dr. Kalenak opined that Plaintiff would need
significantly more than the usual number of breaks provided to an
employee by an employer to rest,[36] and that Plaintiff would miss
more than the number of days a month tolerated by an employer due
to his medical conditions.[37]

     A review of the administrative record in this case shows
that Dr. Kalenak's opinion regarding Plaintiff's work-related
limitations as a result of his medical conditions is supported by
substantial evidence, including his treatment records, his

---

[36]See Taylor v. Barnhart, 474 F.Supp.2d 650, 669-70
(D.Del.2007)("According to the VE, if a person had to take four
unscheduled breaks of 15 minutes in length during a normal
workday, 'a person would miss an hour a day on an unscheduled
basis, which would exceed normal work tolerances.'"); Rush v.
Barnhart, 432 F.Supp.2d 969, 984 (D.N.Dak.2006)(VE testified that
normal breaks during workday would be 15-minute breaks in the
morning and afternoon); Smith v. Commissioner of Social Security,
No. 09-182, 2009 WL 2762687 (W.D.Pa.2009)(According to the VE, it
is customary for an employer to give an employee 3 breaks during
the workday); Brueggen v. Barnhart, No. 06-154, 2006 WL 5999614,
at *2 (W.D.Wis. Dec. 15, 2006)(VE testified that for unskilled
work, bathroom breaks would typically be limited to the "normal"
morning and afternoon break periods and the lunch break); Metzger
v. Barnhart, No. 03-3368, 2004 WL 2092010, at *5 (D.Minn. Sept.
16, 2004)(VE testified that anything beyond a roughly 15-minute
break in the morning and afternoon and a 30-minute lunch would
not be tolerated by an employer).

[37]See Dixon v. Massanari, 270 F.3d 1171, 1179 (7th Cir.2001)
(VE testified that most employers would tolerate 2 missed days of
work per month, but not 3); Sherman v. Astrue, 617 F.Supp.2d 384,
392 (W.D.Pa.2008)(VE testified that an employer would not
tolerate more than one absence per month); Cross v. Commissioner
of Social Security, No. 07-950, 2008 WL 4425851, at *2 (W.D.Pa.
Sept. 30, 2008)(VE testified that an employer's tolerance of
employee absenteeism is generally one absence per month in
unskilled work, two on occasion).

referral of Plaintiff for evaluations by heart and lung
specialists, reports of Plaintiff's diagnostic studies and blood
tests, and the number of medications (20) prescribed for
Plaintiff in an attempt to control his chronic medical
conditions.   In addition, Dr. Kalenak's opinion regarding
Plaintiff's work-related limitations, including Plaintiff's need
for excessive breach and intolerable absenteeism, was
corroborated by Dr. Erukhimov, Plaintiff's long-time
pulmonologist, in the RFC assessments that he completed on August
31, 2007.[38]

Further, Dr. Kalenak's opinion regarding Plaintiff's work-
related limitations was not inconsistent with other substantial
evidence in the record.   As noted by Plaintiff, the Commissioner
did not request a consultative examination in this case.
Therefore, the only contrary medical opinion concerning
Plaintiff's ability to perform competitive work was rendered by a
non-examining State agency medical consultant on April 11, 2006.
(Document No. 10, pp. 8-9).   Clearly, the ALJ erred in according
greater weight to the opinion of a non-examining State agency

---

[38]With respect to the weight to which Dr. Erukhimov's opinion
regarding Plaintiff's work-related limitations was entitled, the
Court notes that more weight generally is given "to the opinion
of a specialist about medical issues related to his or area of
specialty than to the opinion of a source who is not a
specialist."   20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).
Thus, although Dr. Erukhimov's opinion may not have been entitled
to controlling weight due to the absence of his treatment records
for the relevant time period, his opinion was nevertheless
entitled to great weight.

medical consultant that was rendered approximately 1½ years

before the hearing, than to the opinions of two long-time

treating physicians, one of whom is a specialist.  See Brownawell

v. Commissioner of Social Security, 554 F.3d 352, 357 (3d Cir.

2008), citing Dorf v. Bowen, 794 F.2d 896, 901 (3d Cir.1986)(The

Court of Appeals for the Third Circuit has "'consistently held

that it is improper for an ALJ to credit the testimony of a

consulting physician who has not examined the claimant when such

testimony conflicts with testimony of the claimant's treating

physician.'").  Under the circumstances, Plaintiff's motion for

summary judgment will be granted.

## VIII. CONCLUSION

Based on the foregoing, the decision of the ALJ will be

reversed and the case remanded to the Commissioner for a

calculation of the disability benefits to which Plaintiff is

entitled commencing no earlier than February 2006.

William L. Standish

William L. Standish
United States District Judge

Date: September 2⁄, 2009

24